UNITED STATES of America, Appellee,

v.

John SCOTTI, Defendant–Appellant.

UNITED STATES of America, Appellant,

v.

Robert RODRIGUEZ, Defendant–
Appellee.

Nos. 51, 633, Dockets 93–1811, 94–1008.

United States Court of Appeals,
Second Circuit.

Argued Sept. 9, 1994.

Decided Feb. 10, 1995.

Felix T. Gilroy, Staten Island, NY, for defendant-appellant John Scotti.

Joseph Nocella, Asst. U.S. Atty., E.D.N.Y., Brooklyn, NY (Zachary W. Carter, U.S. Atty. and Peter A. Norling, Asst. U.S. Atty., of counsel), for the U.S.

Roger Bennet Adler, P.C., New York City (Karen Bennett, of counsel) for defendant-appellee Robert Rodriguez.

Before: MESKILL, MAHONEY, and WALKER, Circuit Judges.

WALKER, Circuit Judge:

Following a trial in the Eastern District of New York, a jury found defendant John Scotti guilty of all nine counts on which he was indicted: conspiracy to make extortionate extensions of credit, 18 U.S.C. § 892(a); conspiracy to use extortionate means to collect extensions of credit, 18 U.S.C. § 894(a)(1); making extortionate extensions of credit, 18 U.S.C. § 892(a) (three counts); and knowing participation in the use of extortionate means to collect extensions of credit, 18 U.S.C. § 894(a)(1) (four counts). The jury also found defendant Robert Rodriguez guilty of the two counts on which he was indicted: conspiracy to use extortionate means to collect extensions of credit, 18 U.S.C. § 894(a)(1) (Count Two of the Superseding Indictment), and knowing participation in the use of extortionate means to collect extensions of credit, or aiding and abetting the same, 18 U.S.C. §§ 894(a)(1), 2 (Count Seven).

After the verdicts were returned, the district court (Eugene H. Nickerson, *Judge*) granted Rodriguez's motion under Rule 33 of the Federal Rules of Criminal Procedure for a new trial on both Count Two and Count Seven. Judge Nickerson denied motions by Scotti for a judgment of acquittal or a new trial, entering judgment against him on all counts and sentencing him to 78 months of incarceration, a term of supervised release, a fine, a special condition of probation, and an order of restitution. The government appeals from the district court's order granting Rodriguez a new trial, and Scotti appeals from his convictions and sentence.

## I. BACKGROUND

The government's case portrayed the defendant John Scotti as an extortionist progressively tightening his grip on his debtor, Gary Gough, and Gough's family, with the aid of co-defendant Robert Rodriguez. As the 1980's drew to a close, Gough was trapped in a life of gambling, frequenting massage parlors, consorting with prostitutes, and abusing cocaine. These expensive habits could not be maintained with the income he drew as a part-owner of and limousine dispatcher at Staten Car Service in Staten Island, New York, and soon enough a loanshark drifted into this sea of drugs, vice, and fast living. In 1988, on the advice of Charlie Trammaci, a Staten Island deli owner, Gough turned to Scotti to bankroll his excesses. Over the next two years, Gough borrowed $9,000 from Scotti at an interest rate of 4% per week. Trammaci and Scotti paid regular visits to Gough to collect the money. When Gough slipped behind on his weekly payments, Scotti threatened to break his legs and kill him.

In December, 1990, Gough and Anthony Esposito, Gough's uncle and a co-owner of the car service, jointly borrowed $7,000 from Scotti for their business. The two hoped to repay that sum, plus interest of $1500, almost immediately with an expected benefit check from a life insurance policy held on Gough's mother, who had recently died. When the insurance check was slow in arriving, Scotti threatened to burn down Esposito's house. Scotti, with Trammaci at his side, also stormed into Gough's office and struck him in the mouth while he was speaking with a customer on the phone. Some months later, Scotti accosted Gough again, punching him approximately six times in the face and reissuing threats to break his legs and kill him if payments were not made. Gough testified that he paid Scotti approximately $50,000 from 1988 to mid-1991.

Unsated by Gough's payments, Scotti turned to John Egnat, Gough's cousin and the third co-owner of Staten Car Service. In April of 1991, Scotti demanded of Egnat $23,000 to cover the outstanding principal and interest on Gough's and Esposito's $7,000 loan. When Egnat protested that he had never borrowed money from Scotti, Scotti threatened to break Egnat's legs and burn down Egnat's house with his elderly mother inside. After the car service went out of business in July of 1991, Egnat arranged to refinance his house in an effort to come up with the funds. When Egnat informed Scotti in September that the refinancing would yield $15,500, Scotti announced that the debt was now $70,000. But being, in his own words, "a nice guy," Scotti reduced the debt to $50,000, and promised he would find someone to arrange a second mortgage for Egnat.

That someone was defendant Robert Rodriguez, a licensed mortgage broker.

In October, 1991, Scotti brought Rodriguez over to Egnat's house and instructed Egnat to supply Rodriguez with the necessary paperwork for taking out a second mortgage. Egnat repeatedly told Rodriguez about Scotti's threats, the fact that he had never borrowed money from Scotti, and his doubts about taking a second mortgage. Rodriguez replied that he did not want to know about such things and was merely going to assist him in obtaining a mortgage.

On January 7, 1992, Scotti, Rodriguez, and Egnat met at Egnat's house. Egnat paid Scotti the $15,500 from the refinancing, and, in Scotti's presence, signed the application for the second mortgage that Rodriguez had brought with him. Two months later, Egnat met with Rodriguez and Rodriguez's wife, a loan officer at Arbor National Mortgage, to complete the application. In filling out the application, Rodriguez's wife inflated the monthly income Egnat earned from a rental property and falsely stated that the purpose of the mortgage was for "retirement investment."

After the application was submitted, an appraiser came to the Egnat home, but Egnat refused to let him in. When Scotti learned of this, he told Egnat that he would burn Egnat's house down. At this point, Egnat turned for help to the Federal Bureau of Investigation. With the FBI's assistance, Egnat began recording his conversations with Scotti and Rodriguez. Those recordings reveal that Rodriguez kept Scotti informed throughout of the status of the mortgage application and that on one occasion Rodriguez had Scotti hand-deliver necessary papers from the bank to Egnat. However, in these recorded conversations, Rodriguez persistently rebuffed Egnat's efforts to tell him about Scotti's threats. Other than once informing Egnat that his "best bet [was] to ... get it over with," Rodriguez voiced no opinion on the matter, responding repeatedly that he did not want to get involved or know anything. On July 15, 1992, the FBI arrested Scotti, and on January 19, 1993, the government filed a superseding indictment against both Scotti and Rodriguez.

In his defense, Scotti asserted that he was innocent of all charges, that he advanced Gough and Esposito cars and money pursuant to a specific understanding that he would eventually become a partner in the car service, that he never used or threatened violence to force repayment, and that he was a victim of false accusations by Egnat as part of a scheme to avoid repaying Scotti a legitimate debt. Rodriguez's defense was that he provided Egnat with mortgage brokering services after an introduction from Scotti. He testified that he did not know Scotti to be a violent person, that he never entered into an agreement to help Scotti collect a debt from Egnat, and that Egnat did not even mention Scotti's alleged threats until July 13, 1992, only two days before Scotti's arrest.

After a six-day trial, the jury rendered guilty verdicts against both Scotti and Rodriguez on all counts on which they were charged. However, Judge Nickerson granted Rodriguez a new trial on both the conspiracy and substantive counts of 18 U.S.C. § 894, Counts Two and Seven respectively, on the belief that the instruction to the jury on conscious avoidance misstated the requirement of knowing participation in the use of extortionate means to collect an extension of credit. The government appeals from the order granting a new trial to Rodriguez, and Scotti appeals from his conviction and sentence.

## II.  DISCUSSION

### A.  *Grant of New Trial to Rodriguez*

■ The government contends that the district court erred in granting Rodriguez's motion for a new trial after the jury returned verdicts of guilty on both Count Two and Count Seven. We review the district court's decision to grant a new trial for abuse of discretion. *United States v. Sanchez,* 969 F.2d 1409, 1414 (2d Cir.1992).

### 1.  Instruction on Principal Liability under 18 U.S.C. § 894(a)(1)

The district court granted Rodriguez a new trial because it feared that its jury instructions misstated an element of the substantive offense under § 894(a)(1). Under

that statute, "[w]hoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means (1) to collect or attempt to collect any extension of credit" is guilty of a criminal offense. 18 U.S.C. § 894(a). "Extortionate means" is defined as "any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person." 18 U.S.C. § 891(7).

■ The jury instruction that prompted Judge Nickerson to order a new trial was a "conscious avoidance" charge on the element of "knowingly participates" under § 894(a)(1). It is the rule of this circuit that when knowledge is an element of an offense, trial courts may give a conscious avoidance charge if the evidence would permit a rational juror to conclude that a defendant was "aware of a high probability of the fact in dispute and consciously avoided confirming that fact." *United States v. Rodriguez*, 983 F.2d 455, 458 (2d Cir.1993). The government requested the charge on the theory that Rodriguez deliberately shut his eyes to the fact that he was taking part in an extortion. Over Rodriguez's objection, the district court gave the following instruction:

> If you find beyond a reasonable doubt that Robert Rodriguez was aware that there was a high probability that the purpose of the mortgage he had been brokering was *to facilitate the collection, through extortionate means,* of an extension of credit, but that he deliberately and consciously avoided confirming this fact so that he could deny knowledge if apprehended, then you may treat this deliberate avoidance as the equivalent of knowledge, unless you find that the defendant actually believed that the mortgage proceeds would not be used to facilitate the collection, through extortionate means, of extensions of credit.

(Emphasis added).

In granting the motion for a new trial, the district court decided that its instruction was

erroneous. Judge Nickerson concluded that mere facilitation of collection cannot amount to participation within the ambit of the extortionate collection statute. In his view, "unless Rodriguez used 'extortionate means,' that is, explicit or implicit threats of violence, or participated in some way, not merely to supply funds to be used to pay the debt, but to reinforce the threats made by Scotti, Rodriguez may not be convicted of a violation of 18 U.S.C. § 894." *United States v. Rodriguez*, No. CR 92–1061, 1993 WL 534314, at *3 (E.D.N.Y. Dec. 16, 1993). The district court determined that the instruction, coupled with the prosecutor's comment in summation indicating that supplying funds to the victim was sufficient to constitute a violation of § 894(a)(1), may have misled the jury. The instruction and summation could have led the jury to believe that it could find Rodriguez guilty for merely arranging Egnat's mortgage as long as he knew or consciously avoided knowing that the purpose of obtaining the mortgage proceeds was to pay off a debt that Scotti was attempting to collect through extortion. *Id.*

On appeal, the government argues that the instruction was proper and cannot serve as a basis for granting a new trial. Rodriguez counters that the order of a new trial should be affirmed because (1) conscious avoidance instructions are never proper on the element of knowing participation under § 894(a)(1), and (2), as the district court held, the particular instruction issued in this case misstated that element of the offense. While we find no fault with giving an appropriate conscious avoidance charge on the issue of knowing participation under § 894(a)(1), we do agree with Rodriguez and the district court that the conscious avoidance charge given here misstated that element of the offense.[1]

■ Rodriguez's argument that a conscious avoidance charge is inappropriate on the issue of knowing participation is bot-

---

1. Rodriguez also claims that there was an inadequate factual predicate to issue a conscious avoidance instruction. *See United States v. Civelli*, 883 F.2d 191, 195 (2d Cir.1989), *cert. denied*, 493 U.S. 966, 110 S.Ct. 409, 107 L.Ed.2d 374 (1989). Since we find that the instruction mis-

stated an element of the offense, we do not reach that claim. We leave to the district court on retrial the issue whether under 18 U.S.C. § 894(a)(1), as construed in this opinion, there exists a factual predicate for a conscious avoidance instruction.

tomed on *United States v. Mankani,* 738 F.2d 538 (2d Cir.1984) and *United States v. Lanza,* 790 F.2d 1015 (2d Cir.), *cert. denied,* 479 U.S. 861, 107 S.Ct. 211, 93 L.Ed.2d 141 (1986). However, these cases are inapposite. They hold that such a charge is inappropriate on the fact issue of knowing participation in a conspiracy. *See Lanza,* 790 F.2d at 1022–23; *Mankani,* 738 F.2d at 547 n. 1. The reason that we do not permit conscious avoidance instructions on the issue of knowing participation in a conspiracy is that it is logically impossible for a defendant to intend and agree to join a conspiracy if he does not know that it exists. As we asked in *Mankani,* "[i]f someone can consciously avoid learning of the activities and objects of a conspiracy, how can that person ever intend those events to take place?" 738 F.2d at 547 n. 1; *see also Lanza,* 790 F.2d at 1023 (requiring accused have not actual knowledge of all the precise objects of the conspiracy but *"some* knowledge of its unlawful aims").

Here, the knowledge at issue does not pertain to membership in a conspiracy, but participation in conduct proscribed by the substantive offense of § 894(a)(1) (which is the object of the conspiracy offense of the same statute): namely, the use of any extortionate means to collect an extension of credit. In such a case, where guilty knowledge is at issue, a conscious avoidance instruction is proper. *Mankani,* 738 F.2d at 547 n. 1.

The substantive offense of § 894(a)(1) requires that the accused participate in the extortion by some affirmative act; the accused may not escape liability by nurturing a calculated ignorance about whether his acts contributed to the extortion. Conscious avoidance instructions therefore facilitate the conviction of defendants whose conduct Congress clearly meant to outlaw under § 894(a)(1). *See United States v. Bigelow,* 914 F.2d 966, 970–71 (7th Cir.1990), *cert. denied,* 498 U.S. 1121, 111 S.Ct. 1077, 112 L.Ed.2d 1182 (1991); *United States v. Touloumis,* 771 F.2d 235, 243–44 (7th Cir.1985) (upholding conviction of creditor who maintained calculated ignorance of hired collector's tactics); *United States v. Muscarella,* 585 F.2d 242, 247, 252 (7th Cir.1978) (upholding conviction of collector who showed up at two extortion meetings and advised debtor to pay but who did not apparently make direct threats). We decline to state a general rule barring conscious avoidance charges on knowing participation under § 894(a)(1).

■ We turn now to the question whether the district court correctly concluded that the conscious avoidance instruction it gave misstated an element of the offense. In granting a new trial, the district court held that, contrary to its instruction, brokering a mortgage knowing that its purpose was to facilitate an extortionate collection cannot constitute "knowing participation" under § 894(a)(1). *Rodriguez,* 1993 WL 534314, at *3. The government argues that the instruction was entirely proper. In its view, the statute should be construed broadly to reach anyone who "knowingly [becomes] the instrumentality through which the loanshark's collection tactics could bear fruit."

■ In construing a statute, we must rely on its plain language absent a clearly expressed legislative intention to the contrary. *United States v. Granderson,* —— U.S. ——, ——, 114 S.Ct. 1259, 1278, 127 L.Ed.2d 611 (1994). The text of § 894(a)(1) militates against the construction the government advances. As the district court noted, the statute by its terms criminalizes participation in the use of extortionate means, not in the debt collection in which extortion is used. *Rodriguez,* 1993 WL 534314, at *2–*3. This language suggests that Congress intended to hold criminally liable those who play a role in the extortion itself, not those who merely facilitate the collection of funds knowing extortion is afoot. *Cf. United States v. Pacione,* 738 F.2d 567, 571–72 (2d Cir.1984) ("[C]ongress was concerned primarily with the use of actual and threatened violence by members of organized crime engaged in loan sharking."). The construction the government urges would extend the reach of § 894(a)(1) to cover even the benevolent arrangement of financing by a person to save the debtor, so long as it is known that the debtor will use the funds to pay off the extortionist. Accordingly, we hold that the defendant must play some role in the extortion itself to incur liability under 18 U.S.C. § 894(a)(1); merely being the knowing "in-

strumentality through which the loanshark's collection tactics could bear fruit," contrary to the government's contention in its brief, is not sufficient.

Because the issue will likely arise on retrial, we take note of the district court's observation that Rodriguez can only be convicted of a § 894(a)(1) offense if there is proof that he used extortionate means himself, perhaps by reinforcing threats made by Scotti, *see Rodriguez,* 1993 WL 534314, at *3. This seems an unduly narrow reading of the statute. The statute makes it an offense if one "knowingly participates *in any way* ... in the use of any extortionate means" to collect an extension of credit. 18 U.S.C. § 894(a)(1) (emphasis added). The breadth of the language reflects Congress's desire to craft a flexible set of tools for prosecutors to wield with "vigor and imagination," H.R.Conf.Rep. No. 1397, 90th Cong., 2d Sess. 31, *reprinted in* 1968 U.S.C.C.A.N. 2021, 2029, to shut down what it had found to be the second largest source of revenue for organized crime, *see Perez v. United States,* 402 U.S. 146, 155, 91 S.Ct. 1357, 1362, 28 L.Ed.2d 686 (1971) (discussing legislative history), and to allay problems of proof that had stymied prior efforts to prosecute organized crime under the Hobbs Act, *see United States v. DiPasquale,* 740 F.2d 1282, 1288 (3d Cir. 1984), *cert. denied,* 469 U.S. 1228, 105 S.Ct. 1226, 84 L.Ed.2d 364 (1985); *Pacione,* 738 F.2d at 570. Section 894(a)(1) is therefore not confined in its reach to those who directly threaten or commit acts of violence, but encompasses indirect participation in the use of extortionate means. *Cf. Bigelow,* 914 F.2d at 969–71 (upholding conviction of creditor who hired extortionist collectors). Contrary to the view of the district court, it seems to us that the provision of financing might be sufficient for liability in circumstances in which it is closely interwoven with and facilitates the use of extortionate means.

■ We also reject a narrowing of the statute on different grounds suggested by Rodriguez. He urges us to construe the statute "to criminalize only those actions specifically intended" by a defendant to further the extortion. At first blush, Rodriguez's argument seems to have merit. In dealing with a defendant who actually commits acts of violence or issues threats, we have held that "[t]o be convicted [under 18 U.S.C. § 894(a)(1) ], the defendant must have intended to make a 'threat of use[ ] of violence or other criminal means[ ] to cause harm to the person, reputation, or property of [another] person.'" *United States v. Natale,* 526 F.2d 1160, 1168 (2d Cir.1975) (quoting 18 U.S.C. § 891(7)), *cert. denied,* 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976); *see also United States v. Polizzi,* 801 F.2d 1543, 1556 (9th Cir.1986); *United States v. Sears,* 544 F.2d 585, 588 (2d Cir.1976). Moreover, a secondary participant in an extortion, as Rodriguez is accused of being, might be likened to an aider and abettor, and the well-settled rule is that the government must prove that an accused aider and abettor had "the specific intent that his act or omission bring about the underlying crime." *United States v. Aiello,* 864 F.2d 257, 262–63 (2d Cir.1988).

The Supreme Court, however, has cautioned courts against too readily imposing heightened *mens rea* requirements in construing federal criminal statutes. In *United States v. Bailey,* 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980), the Court confronted the question whether "an intent to avoid confinement" should be read into the statute criminalizing escape from federal custody, 18 U.S.C. § 751(a). *Id.* at 408, 100 S.Ct. at 633. Recognizing that the common-law distinction between the terms "specific intent" and "general intent" "has been the source of a good deal of confusion" in criminal law, *id.* at 403, 100 S.Ct. at 631, the Court observed that the more appropriate question is whether a criminal statute requires "knowledge" or "purpose." *Id.* at 403–04, 100 S.Ct. at 631–32. The requirement of knowledge "corresponds loosely with the concept of general intent." *Id.* at 405, 100 S.Ct. at 632. It is met if the government proves that a defendant was aware that a result proscribed by the statute was "practically certain to follow from his conduct, whatever his desire may be as to that result." *Id.* at 404, 100 S.Ct. at 631–32 (quotations omitted). On the other hand, the requirement of purpose, which "corresponds loosely with the common-law concept of specific intent," *id.* at 405, 100 S.Ct. at 632,

demands that a defendant who causes a particular result have "consciously desire[d] that result, whatever the likelihood of that result happening from his conduct," *id.* at 404, 100 S.Ct. at 631 (quotations omitted). The element of purpose has been required in "certain narrow classes of crime ... [in which] heightened culpability has been thought to merit special attention." *Id.* at 405, 100 S.Ct. at 632.

Turning to the application of *mens rea* analysis to federal criminal statutes, the Court noted that, first, courts "must follow Congress' intent as to the required level of mental culpability for any particular offense." *Id.* at 406, 100 S.Ct. at 632. Second, courts should avoid inferring "hair-splitting distinctions, either traditional or novel, that Congress neither stated nor implied when it made the conduct criminal." *Id.* at 407, 100 S.Ct. at 633. With those precepts in mind, the Court refused to read a requirement of purpose into the escape statute when "[n]othing in the language or legislative history of § 751(a) indicate[d] that Congress intended to require ... such a heightened standard of culpability...." *Id.* at 408, 100 S.Ct. at 634.

Unlike the federal escape statute considered in *Bailey,* where both the statute and its legislative history were silent as to the *mens rea* required for conviction, *id.* at 406, 100 S.Ct. at 632–33, § 894(a)(1) expressly specifies that the participation in the extortion need only be "knowing[ ]." We see no reason to require a mental state of purpose or specific intent for all defendants accused of participation in an extortionate collection when Congress has declined to do so.

Our holding is not inconsistent with *Natale.* In that case, we required a showing that a defendant committing or threatening violence had the purpose to extort in order to clarify the element of "extortionate means," not the element of "knowingly participates." The question in *Natale* was whether the means could be considered extortionate, as defined in 18 U.S.C. § 891(7), only if the victim had been placed in actual fear. *See* 526 F.2d at 1168. We held that acts or statements need only be "reasonably calculated" to instill fear in the victim in order to qualify as extortionate. *Id.* Nothing in *Na-*

*tale* requires that, if another person is committing or about to commit acts reasonably calculated to instill fear in the victim, a defendant who participates in that extortion must also have a specific purpose to extort. Once the extortion is otherwise initiated, it is enough that the defendant knows that his acts as a participant will further the extortion. Indeed, Judge Nickerson's jury instructions properly recognized this distinction. On the element of "extortionate means," he charged the jury that it must find that "the lender intended to take actions which reasonably would induce fear in an ordinary person." This instruction correctly pertained only to Scotti's intent as the lender, not to Rodriguez's. On the issue of Rodriguez's *mens rea,* the district court properly instructed the jury that he need only have knowledge to be guilty of the substantive offense of § 894(a)(1).

■ We also do not find it problematic that, in a seeming paradox, it is easier to prove principal liability under § 894(a)(1) than aiding and abetting under 18 U.S.C. § 2. Conviction as a principal under § 894(a)(1) or as an aider and abettor requires participation in the extortion. *See Nye & Nissen v. United States,* 336 U.S. 613, 619, 69 S.Ct. 766, 769–70, 93 L.Ed. 919 (1949) (aiding and abetting liability attaches if the defendant " 'participate[s] in [the crime] as in something that he wishes to bring about' " (quoting *United States v. Peoni,* 100 F.2d 401, 402 (2d Cir.1938) (L. Hand, J.))). However, as discussed above, aiding and abetting requires a finding of specific intent or purpose to bring about the crime, *see Aiello,* 864 F.2d at 262–63; *Peoni,* 100 F.2d at 402, whereas § 894(a)(1) only requires knowledge.

Nothing in *Peoni,* a judicial construction of the federal aiding and abetting statute based on the common law of accomplice liability, *see id.,* can be read to limit Congress's ability to define the participation crime of § 894(a)(1) to require only the *mens rea* of knowledge. *Cf. Bailey,* 444 U.S. at 406, 100 S.Ct. at 632 ("Principles derived from common law ... must bow to legislative mandates."). The plain language of § 894(a)(1) indicates that Congress decided that extortion was a grave enough evil to warrant criminal liability on

the basis of knowledge alone, *cf. People v. Lauria*, 251 Cal.App.2d 471, 480, 59 Cal.Rptr. 628, 634 (1967) (stating that under California law an operator of a telephone answering service used to facilitate the extortion of ransom "might be chargeable on knowledge alone with participation in a scheme to extort money"), and did not impose the additional *mens rea* requirement of specific intent or purpose to bring about the crime.

In summary, a defendant may only be convicted of a § 894(a)(1) offense if he knowingly plays some role in the extortion itself, but not if he merely performs acts that he knows will facilitate a debtor's repayment of a debt being collected by extortionate means. Since the conscious avoidance instruction indicated that even the latter would suffice for liability, we hold that the district court did not abuse its discretion in granting a new trial based on the erroneous instruction.

### 2. Aiding and Abetting Liability

■ Even if the instruction on principal liability given in this case was erroneous, the government contends that the guilty verdict against Rodriguez on Count Seven should nevertheless be sustained on an aiding and abetting theory. We disagree. Count Seven allowed the jury to convict Rodriguez as either a principal or aider and abettor, and, since the verdict was a general one, it is unclear on what theory the jury decided Rodriguez's guilt. Because the jury may have reached its verdict on the basis of the legally inadequate instructions on principal liability under § 894(a)(1), we conclude that the district court did not abuse its discretion in granting Rodriguez a new trial on Count Seven. *Cf. Griffin v. United States*, 502 U.S. 46, 58, 112 S.Ct. 466, 474, 116 L.Ed.2d 371 (1991) (acknowledging permissibility of invalidating general verdict when one of the possible bases of conviction was legally inadequate); *Yates v. United States*, 354 U.S. 298, 312, 77 S.Ct. 1064, 1073, 1 L.Ed.2d 1356 (1957) ("[T]he proper rule to be applied is that which requires a verdict to be set aside where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected."), *overruled on other grounds, Burks v. United States*, 437 U.S. 1, 12, 98 S.Ct. 2141, 2147–48, 57 L.Ed.2d 1 (1978).

Count Seven of the Superseding Indictment charged in its entirety:

On or about and between July 31, 1991 and July 14, 1992, both dates being approximate and inclusive, within the Eastern District of New York, the defendants JOHN SCOTTI and ROBERT RODRIGUEZ did knowingly and wilfully participate in the use of extortionate means, as defined in Title 18, United States Code, Section 891(7), to collect and attempt to collect from John Egnat an extension of credit.

(Title 18, United States Code, Sections 894(a)(1), 2 and 3551 *et seq.*).

The reference to 18 U.S.C. § 2, the federal aiding and abetting statute, gave the jury the choice of finding the defendants guilty either as a principal or an aider and abettor. The court charged the jury accordingly, stating, "The indictment charges defendant Robert Rodriguez with using extortionate means to collect or attempt to collect extensions of credit in Count Seven and with aiding and abetting the extortionate collection of extensions of credit."

■ Had Count Seven charged Rodriguez only with aiding and abetting, reinstatement of the jury verdict might be warranted. Judge Nickerson's jury instructions flawlessly recounted the elements of aiding and abetting. *Cf. Aiello*, 864 F.2d at 262–63 ("To convict a defendant under a theory of aiding and abetting the commission of a crime ..., the government must prove: (1) commission of the underlying crime, (2) by a person other than the defendant, (3) a voluntary act or omission by the person charged as an aider and abettor, with (4) the specific intent that his act or omission bring about the underlying crime." (citations omitted)). The erroneous conscious avoidance charge pertained only to Rodriguez's liability as a principal. Because the jury was properly instructed as to Scotti's liability as a principal, and found him guilty, any error in the conscious avoidance charge would have had no effect on the jury's determination of whether Rodriguez aided and abetted Scotti's crime. Thus, if a separate aiding and abetting count

were charged and we were to find the evidence sufficient to convict Rodriguez on that theory (an issue we do not decide on this appeal), a reversal of the district court's grant of a new trial on Count Seven would be in order.

The problem in this case is that, given the form of the indictment, we do not know whether the jury found Rodriguez guilty as a principal or an aider and abettor. The jury merely returned a general verdict of guilty on Count Seven, and thus did not indicate on what theory its verdict rested.

Although Rodriguez may be punished as a principal if convicted as an aider and abettor, see *United States v. Schwartz*, 548 F.2d 427, 430 (2d Cir.1977), the distinction between the two theories of liability is crucial in this case. As explained above, because aiding and abetting requires proof of Rodriguez's purpose to bring about the crime, it is more difficult to prove than principal liability under § 894(a)(1).

Rodriguez's purpose is a closely contested issue in this case. He may have sought to aid Scotti's commission of the crime, or he may have sought only to secure his broker's fee and provide Egnat with the needed financing. As the record stands, we are unable to determine whether the jury based its verdict on Count Seven on the correctly charged aiding and abetting theory or the less exacting but erroneously charged theory of principal liability.

If the basis for the jury's verdict on Count Seven was unclear to the district judge who, after sitting through the trial, decided to set it aside, we are in no better position to determine the matter based on the cold record on appeal. Because of this uncertainty, we are unable to say that the district court abused its discretion in setting aside the conviction on Count Seven and granting a new trial. Therefore, we affirm the order of a new trial for Rodriguez on Count Seven.

### 3. Conspiracy liability

The jury also found Rodriguez guilty of Count Two of the Superseding Indictment, which charged him with conspiracy to use extortionate means to collect or attempt to collect any extension of credit. The government argues that the conspiracy verdict should stand even if the jury's verdict on Count Seven must be set aside. The erroneous conscious avoidance charge applied only to Rodriguez's liability as a principal; the jury was properly instructed on the elements of conspiracy; and the jury found Rodriguez guilty as charged. Since it is immaterial to a conspiracy charge whether Rodriguez could properly be convicted of the substantive offense or not, the government argues, the conspiracy verdict is untainted.

Even though the district court set aside the conspiracy verdict on Count Two without giving separate reasons for its decision, we cannot say that it abused its discretion in so doing. In this context, there is a substantial risk of prejudicial spillover of the kind we discussed in *United States v. Rooney*, 37 F.3d 847, 855–56 (2d Cir.1994). Common sense and experience tell us that it is more likely that the jury will find a defendant guilty of conspiracy if it also finds him guilty of the substantive offense that is the object of the conspiracy. We are also reluctant to say that the court abused its discretion in vacating the conspiracy conviction when the jury received an erroneous instruction on the only object of the conspiracy charged in Count Two.

Accordingly, we affirm the district court's grant of a new trial to Rodriguez on Count Two.

### B. *John Scotti*

John Scotti raises four challenges on appeal: (1) the district court improperly restricted his right of cross-examination of government witnesses; (2) the district court erred by not requiring the government to produce an FBI agent's handwritten notes of a witness interview; (3) numerous due process errors occurred; and (4) the district court failed to make the requisite findings of facts in imposing a sentencing enhancement for obstruction of justice. We address each of these issues in turn.

#### 1. Restriction on cross-examination and presentation of evidence

▮▮▮▮ Scotti claims that the district court improperly curtailed his cross-examina-

tion of government witnesses and presentation of evidence. Our review of such questions is limited. As we said in *United States v. Concepcion,* 983 F.2d 369, 391–92 (2d Cir. 1992):

> The scope and extent of cross-examination lies within the discretion of the trial judge. The trial court may, in its discretion, preclude questions for which the questioner cannot show a good faith basis. So long as the jury has before it sufficient information to make a discriminating appraisal of the witness's possible motives for testifying falsely in favor of the government, we will uphold the trial court's exercise of its discretion.

(quotations and citations omitted), *cert. denied,* — U.S. —, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993); *see also United States v. Scarpa,* 913 F.2d 993, 1018 (2d Cir.1990); *United States v. Tillem,* 906 F.2d 814, 827 (2d Cir.1990).

Scotti alleges first that the district court improperly restricted him from eliciting testimony about Gary Gough's HIV (Human Immunodeficiency Virus) infection and presenting testimony about Scotti's awareness of it. He argues that this evidence cumulatively would have made it seem improbable that Scotti would have risked infection by drawing blood when he punched Gough in the face, as Gough testified. Scotti did. Scotti's counsel summed up the defense's theory succinctly at oral argument: "I would think a reasonably intelligent person in today's society would not go around bloodying people's faces if they had AIDS. I think maybe they'd take a bat."

Whatever the tactics of the "reasonably intelligent" extortionist, Scotti's beliefs as to Gough's HIV infection and the factual basis for those beliefs were in fact relevant evidence. *See* Fed.R.Evid. 401. As Scotti contends, such evidence is at least somewhat probative of the occurrence (or, more precisely, the non-occurrence) of material facts: namely, the acts of violence that supplied in part the predicate for Scotti's conviction on Count Four of using extortion against Gough to collect an extension of credit. Of course, the district court could still have excluded this evidence on the grounds of prejudice, confusion, or waste of time. Fed.R.Evid. 403.

The chief problem with Scotti's relevance argument regarding Gough's HIV infection is that he never made it until both the prosecution and defense had rested. When the issue arose at trial, Scotti's claim for admissibility focused solely on Gough's credibility. In response to the government's objection about his inquiry into Gough's HIV infection, Scotti simply framed the issue as whether Gough "g[o]t it sexually, or [is he] someone who took heroin, the needle?" Since Gough's drug habits and sexual proclivities were already in evidence, examination into the source of Gough's malady was at best cumulative and at worst highly prejudicial. On those grounds, the district court was justified in excluding the evidence, especially given the risk that a juror might impermissibly discredit Gough solely because of his HIV status. If Scotti had an alternative theory of relevance, it was his burden to alert the court to it. *See United States v. Pugliese,* 712 F.2d 1574, 1580 (2d Cir.1983); *United States v. Kelly,* 556 F.2d 257, 265 (5th Cir.1977) (finding no error in excluding evidence where offeror failed to argue relevance to the court), *cert. denied,* 434 U.S. 1017, 98 S.Ct. 737, 54 L.Ed.2d 763 (1978); 22 Charles A. Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5166, at 69 & n. 20. Since counsel waited until both sides had rested to unveil his theory that evidence of Gough's HIV status was probative as to whether Scotti punched him in the face, it was not an abuse of discretion for the district court to deny Scotti's request to recall witnesses to explore this issue after the close of evidence.

Scotti also complains that the district court restricted his questioning of defense witness Al Schwendeman, a former employee of the Staten Car Service, about the drug habits and financial dealings of its principals. The relevance of the excluded testimony is not apparent to us, and such testimony, if intended for impeachment purposes, runs afoul of the rule against introduction of extrinsic evidence of prior bad acts. Fed.R.Evid. 608(b). Thus, we find that this claim lacks merit.

### 2. Discovery of FBI Agent's Notes

Agent Brian Taylor of the Federal Bureau of Investigation took notes of an interview with John Egnat and later filed a written report of that interview on FBI form FD–302. Taylor acknowledged on cross-examination that he retained his handwritten notes. While the formal interview report was disclosed to Scotti, the handwritten notes were not. Scotti made motions during and after trial for production of the notes, but the district court did not order discovery. Scotti contends that production of the notes was mandatory under Federal Rule of Criminal Procedure 26.2.

Under Rule 26.2, the court, upon motion by a party after the adverse party's witness has testified on direct examination, shall order the production by the adverse party's attorneys of any statement of the witness "that is in their possession and that relates to the subject matter concerning which the witness has testified." Fed.R.Crim.P. 26.2(a). Statements for purposes of this Rule are

(1) a written statement made by the witness that is signed or otherwise adopted or approved by the witness;

(2) a substantially verbatim recital of an oral statement made by the witness that is recorded contemporaneously with the making of the oral statement and that is contained in a stenographic, mechanical, electrical or other recording or a transcription thereof; or

(3) a statement, however taken or recorded, or a transcription thereof, made by the witness to a grand jury.

Fed.R.Crim.P. 26.2(f). The procedural requirements for making a motion for production and the definition of "statements" essentially track those of the Jencks Act. *Compare* 18 U.S.C. § 3500(b) *with* Fed.R.Crim.P. 26.2(a)-(b); *compare* 18 U.S.C. § 3500(e) *with* Fed.R.Crim.P. 26.2(f). *Cf.* Fed. R.Crim.P. 26.2(f) Advisory Committee's Note, 1979 Addition (stating that Rule 26.2 places in the criminal rules the substance of 18 U.S.C. § 3500 while also providing for production of statements of defense witnesses).

■ Because Scotti made his first motion for the notes after Agent Taylor's direct testimony, it appears that he sought the notes as Taylor's prior statement. However, the handwritten notes are not Taylor's "statement" within the meaning of Rule 26.2(f)(1). Absent any indication that an FBI agent signs, adopts, vouches for, or intends to be accountable for the contents of the notes, the rough notes taken in a witness interview cannot be considered the agent's statement. *United States v. Gotchis*, 803 F.2d 74, 77–78 (2d Cir.1986). Nor, of course, do the notes qualify as Taylor's statements under subsections (2) or (3) of Rule 26.2(f) since they are neither a substantially verbatim recording of Taylor's oral statements nor a recording of any statement by him to the grand jury. Thus, Rule 26.2 did not mandate production of the notes as Agent Taylor's statement.

■ The notes may have been discoverable as a statement by John Egnat, one of the government's witnesses. In the circumstances of this case, Scotti would have been entitled to discovery of the notes if either of two conditions obtained: (1) Egnat "adopted or approved" Taylor's notes as his own statement, 18 U.S.C. § 3500(e)(1); Fed.R.Crim.P. 26(f)(1); or (2) the notes were a substantially verbatim recital of Egnat's words, even if the interview was not automatically recorded, 18 U.S.C. § 3500(e)(2); Fed.R.Crim.P. 26(f)(2); *Palermo v. United States*, 360 U.S. 343, 351–53, 79 S.Ct. 1217, 1224–25, 3 L.Ed.2d 1287 (1959) (interpreting 18 U.S.C. § 3500(e)(2)). Even if not an exact recording, the notes would be considered a substantially verbatim recital of the witness's statement if they "could fairly be deemed to reflect fully and without distortion what had been said to the government agent" and thus be used to impeach the witness's testimony at trial. *Id.* at 352, 79 S.Ct. at 1224; *United States v. Aviles*, 337 F.2d 552, 556 (2d Cir.1964), *cert. denied*, 380 U.S. 906, 85 S.Ct. 885, 13 L.Ed.2d 794 (1965). When it is doubtful whether the notes are subject to discovery, the government should submit them to the trial court for an *in camera* determination; the court may in its discretion consider extrinsic evidence in deciding whether the notes qualify as a witness statement. *Paler-*

mo, 360 U.S. at 354–55, 79 S.Ct. at 1225–26; United States v. Lamma, 349 F.2d 338, 340 (2d Cir.), cert. denied, 382 U.S. 947, 86 S.Ct. 407, 15 L.Ed.2d 355 (1965).

■ The defendant, however, is only entitled to production of the notes, or to a determination whether they must be produced, if he makes a timely and sufficient motion. The plain language of both Rule 26.2 and 18 U.S.C. § 3500(a) shows that the "discovery procedure therein outlined applies only to statements that must be produced after a witness testifies at the trial." United States v. Giuliano, 348 F.2d 217, 223 (2d Cir.) (upholding denial of motion under Jencks Act to produce agent's notes for use in hearing to withdraw guilty plea), cert. denied, 382 U.S. 939, 946, 1000, 86 S.Ct. 390, 406, 535, 15 L.Ed.2d 349, 354, 490 (1965); see also United States v. Sebastian, 497 F.2d 1267, 1269–70 (2d Cir.1974) (holding that court cannot compel government to turn over Jencks material at pretrial suppression hearing); United States v. Percevault, 490 F.2d 126, 131 (2d Cir.1974) (holding that court cannot compel pretrial production of Jencks material). A defendant is

under obligation to request production of the statement within a reasonable time proximate to the direct testimony so as to alert the district judge and the government of the nature of his request. Preferably, that request should be made immediately before, during, or immediately after the direct examination, although circumstances might permit requests at different points during the trial.

United States v. Harris, 458 F.2d 670, 679 (5th Cir.) (per curiam), cert. denied, 409 U.S. 888, 93 S.Ct. 195, 34 L.Ed.2d 145 (1972).

Scotti did not make a timely and sufficient motion for production of any of Agent Taylor's notes which might have qualified as Egnat's statement. He made his first request for the notes during his cross-examination of Agent Taylor, the government's opening witness; that request was not in reasonable proximity to Egnat's testimony on direct examination. When Scotti's counsel attempted to cross-examine Agent Taylor on the content of the notes, Judge Nickerson apprised him of the proper use of the notes as impeachment material:

This is all going to be hearsay. The way you can use these notes is if Mr. Egnat gets up and testifies to something and there is something inconsistent in the notes, then you can cross-examine him on that.

Upon timely motion, and a finding that the notes qualified as Egnat's statement, the court clearly would have given Scotti the opportunity to use Agent Taylor's notes to impeach Egnat. But Scotti's counsel did not move for production of the notes at any time right before or after, or during, the government's direct examination of Egnat, and he completed his cross-examination without making a Rule 26.2 motion.

Right after that cross-examination, the government made an application to the court to recall Agent Taylor to inform the jury that, contrary to intimations by Scotti's counsel, there was nothing improper in the way the witness interviews were conducted. The following colloquy ensued:

[SCOTTI'S COUNSEL]: Can I have a copy of those notes? This is described by the notes.

THE COURT: What notes?

[SCOTTI'S COUNSEL]: With Agent Taylor.

[GOVERNMENT]: There maybe [sic] attorney work product, the witness may have seen me. What I have they have no idea what I wrote.

THE COURT: Did the agent write anything?

[GOVERNMENT]: I am not sure.

THE COURT: Whatever he wrote they are entitled to.

[GOVERNMENT]: Whatever he wrote has been given over to them.

At that point, the court called a recess, and the request for notes was not pursued when the court reconvened.

■ Although the meaning of this interchange is somewhat unclear, it appears to us that, even if we construe Scotti's request for the notes liberally as timely and intended for impeachment of Egnat on re-cross, it was insufficient. It had already been established

during the cross-examination of Agent Taylor on the first day of the trial that the handwritten notes had not been disclosed to Scotti; only the formal interview reports had. The government, apparently under the impression that only the formal reports were discoverable, represented to the court that Scotti had all the relevant witness statements. When Scotti did not dispute that fact, the court understandably let matters rest. In light of these circumstances, we think that it was incumbent upon Scotti to state that he did not in fact have possession of all relevant witness statements and move that the court determine if the notes must be produced under Rule 26.2. By failing to challenge the government and press the district court for a ruling on the notes, Scotti effectively abandoned his motion. We find no reversible error where the district court never made a ruling adverse to Scotti during the trial, and even seemed to indicate that, if the issue were properly before it, it would rule in Scotti's favor.

■ Scotti resurrected the issue of the notes in a posttrial motion requesting that the court make a Rule 26.2 finding that the notes were discoverable and order a mistrial based on the government's failure to disclose them. Because Scotti failed to make a timely and sufficient motion for production of the notes at trial, and because a Rule 26.2 motion after trial is untimely, cf. *United States v. Petito*, 671 F.2d 68, 73–74 (2d Cir.), cert. denied, 459 U.S. 824, 103 S.Ct. 56, 74 L.Ed.2d 60 (1982) (motion under Jencks Act); *United States v. Sacasas*, 381 F.2d 451, 454 (2d Cir.1967) (same), the district court did not err in denying Scotti's final motion under 26.2 or his motion for a mistrial.

#### 3. Due Process Claims

Scotti makes sundry claims of due process violations occurring before, during, and after trial. He alleges that (1) the indictment was facially invalid and improperly based on perjured and hearsay testimony, (2) the court refused to give an instruction that the government falsely manufactured evidence by having Egnat tell Rodriguez that Scotti threatened to burn down his house, (3) the jury verdict was tainted by pre-deliberation discussions of the case by jurors and by the posting of a spoof advertisement of a publication on organized crime on a door near the jury deliberation room, and (4) he suffered "retroactive misjoinder" from being tried with Rodriguez. These claims do not warrant further discussion. After careful examination, we find them wholly lacking in merit.

#### 4. Sentencing

■ At sentencing, the district court gave Scotti a two-level enhancement for obstruction of justice under § 3C1.1 of the Sentencing Guidelines because it found that he had committed perjury. Scotti contends that the enhancement was improper because the district court did not make the specific findings of fact necessary under § 3C1.1. The district court merely noted that the jury made a finding of perjury in its verdict "because [Scotti] claimed that he was a totally innocent man, [and the jury] decided otherwise," but he assured the parties that any enhancement would be "based on the evidence that was at the trial." In the government's view, those statements are sufficient to show that the district court did not simply rely on the jury's verdict but made an independent assessment of the perjury claim.

While such a summary disposition of a perjury enhancement request might have passed muster prior to *United States v. Dunnigan*, ── U.S. ──, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993), it no longer does. In *Dunnigan*, the Supreme Court emphasized the importance of a searching inquiry into perjury allegations at sentencing:

> [I]f a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same.... When doing so, it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding.

*Id.* at ──, 113 S.Ct. at 1117. The Court indicated that independent findings on all elements of a perjury violation dispel the "concern that courts will enhance sentences as a matter of course whenever the accused

takes the stand and is found guilty." *Id.* at ——, 113 S.Ct. at 1118. Because the district court made no independent findings on the perjury enhancement, we vacate the sentence and remand the case for resentencing in light of *Dunnigan.*

## III. CONCLUSION

We affirm the district court's order granting Robert Rodriguez a new trial on Counts Two and Seven of the indictment. We affirm the convictions of John Scotti on Counts One through Nine. We vacate the sentence imposed upon Scotti and remand for reconsideration of the obstruction-of-justice enhancement.