UNITED STATES,

v.

CHEN et al.

No. 3:02 CR 5(JBA).

United States District Court, D. Connecticut.

Sept. 2, 2003.

Jeremiah F. Donovan, Old Saybrook, CT, Paul F. Thomas, Federal Public Defender's Office, Michael Stanton Hillis, Dombroski Knapsack & Hillis, New Haven, CT, for defendants.

Peter S. Jongbloed, John A. Danaher, III, · Michael R. Sklaire, U.S. Attorney's Office, New Haven, CT, for U.S. Attorneys.

### Ruling on Motion for Judgment of Acquittal or New Trial [Docs.##74 & 97] [1]

ARTERTON, District Judge.

Following a jury's finding that they violated 18 U.S.C. § 894(a), which prohibits the collection extensions of credit using extortionate means, as well as the conspiracy and attempt to do the same, defendants Steven Chen and Gong Chai Sun have moved for a judgment of acquittal or, alternatively, a new trial, on each count of conviction. As set out below, the motions are denied in their entirety.

## I. Background

The evidence at trial showed that the defendants were involved in the operation of a large-scale loan-sharking enterprise

---

1. This ruling also disposes of both Chen's and Sun's oral motions for judgment of acquittal or new trial, made at the close of the Government's evidence.

that operated out of the Foxwoods Casino, charging mostly Asian borrowers exorbitant interest rates. Cooperating witness Kun Lin testified that he discussed with Chen and Sun investing in their loan-sharking business, Tr. 189, and that Chen had showed him ledgers which reflected the business's outstanding loans to convince him to invest, Tr. 204. Lin was asked to invest $100,000, which was to be paid in cash. Tr. 212. Allan Phillips, an expert witness from the FBI's Racketeering Records Analysis Unit, testified that the ledgers reflected loans to approximately 138 distinct borrowers, Tr. 431, with total loans amounting to $396,000, Tr. 430. The ledgers revealed at least one borrower who was charged 4055% interest, a rate higher than Phillips had seen in any other loan-sharking case he had investigated. Tr. 428. The exhibits introduced at trial included the loan ledgers; transcripts of recorded conversations between Lin, Chen and Sun; and surveillance videos from the gaming floor of the Foxwoods Casino.

The trial evidence also revealed that threats of force were used to induce the payments of these loans. For example, debtor Inguan Teoh testified that Chen told him that: (1) Chen would have 60 people go after Teoh if Teoh did not repay his loans, Tr. 462; (2) "nobody can get away from [Chen] if they don't pay back the money because he got a lot of people work for him collect the money and also he got police personnel work for him," Tr. 469; and (3) if Teoh anticipated problems repaying the loan, Teoh should immediately contact Chen or "[Chen] will get people to go after me," Tr. 470. Teoh explained that every time Chen lent him money, he always reminded Teoh that he had people who would track Teoh down. Tr. 475–476. At one point, an associate of Chen's threatened to blow up Teoh's restaurant when Teoh explained that he could not repay one of Chen's loans, and Teoh heard Chen in the background state, "If [he does not] pay, we are going to blow up his restaurant." Tr. 486.

A three count indictment was returned against the defendants. Count One charged that Chen and Sun conspired to participate in the use of extortionate means to collect and attempt to collect outstanding loans from Inguan Teoh, Chin Shen Hsu and others whose identities were unknown to the Grand Jury, and to punish those debtors for non-payment of the loans, by using and threatening to use violence or other criminal means to harm the debtors. Count Two charged both defendants with using extortionate means to collect and attempt to collect $10,000 in principal and $10,000 per week in interest from Teoh. Count Three concerns victim Hsu, alleging that both defendants collected and attempted to collect "approximately hundreds of thousands of dollars in principal and interest" from Hsu. While the charged offense in Count One is alleged in the indictment to have taken place "in the District of Connecticut and elsewhere," the remaining counts are alleged to have taken place only "in the District of Connecticut."

The jury convicted Chen on all three counts, and convicted Sun on the first and second counts, acquitting him on the third count. Following the jury's verdict, Chen and Sun renewed their oral motions judgments of acquittal or, in the alternative, for a new trial, which had been made at the close of the Government's case and taken under advisement by the Court. The Court requested supplemental briefing after the trial transcripts became available, and oral argument was held.

## II. Standard

Inasmuch as the defendants' motions for judgments of acquittal challenge the sufficiency of the evidence, defendants bear a

heavy burden: the Court must "consider[ ] all of the evidence presented at trial in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government." *United States v. Griffith*, 284 F.3d 338, 348 (2d Cir.2002) (*citing United States v. Naiman*, 211 F.3d 40, 46 (2d Cir.2000)).

[The Court] defer[s] to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence. [The Court] will not disturb a conviction on grounds of legal insufficiency of the evidence at trial if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. These principles apply to both direct and circumstantial evidence.

*Id.* (*citing United States v. Morrison*, 153 F.3d 34, 49 (2d Cir.1998); *United States v. Feliciano*, 223 F.3d 102, 113 (2d Cir.2000); and *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir.2001)) (quotations omitted).

The defendants' alternative requests for a new trial are brought under Fed. R.Crim.P. 33(a), which provides that the Court "may vacate any judgment and grant a new trial if the interest of justice so requires." While the Court has "broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29," it nonetheless "must exercise the Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'" *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir.2001) (*quoting United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir.1992)).

The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice. The trial court must be satisfied that competent, satisfactory and sufficient evidence in the record supports the jury verdict. The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation. There must be a real concern that an innocent person may have been convicted.

*Id.* (*citing Sanchez*, 969 F.2d at 1414) (quotations omitted).

## III. Discussion

The statute under which the defendants were convicted provides:

Whoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means

(1) to collect or attempt to collect any extension of credit, or

(2) to punish any person for the nonrepayment thereof, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 894(a). "An extortionate means is any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person," 18 U.S.C. § 891(7), and "[t]o collect an extension of credit means to induce in any way any person to make repayment thereof," 18 U.S.C. § 891(5).

### A. Counts One and Two

#### 1. Chen

■ The evidence presented at trial was easily sufficient to sustain Chen's conviction for conspiring to use extortionate means to collect extensions of credit (count one) and for using extortionate means to collect extensions of credit from Inguan Teoh (count two). As set out in the "Background" section, *supra*, the evidence showed that Chen and others ran a large-scale loan-sharking operation that operat-

ed in Connecticut during the time period charged in the indictment, and that borrowers were induced to repay these loans with threats of force. From Teoh's testimony that Chen's mantra (repeated each time he lent Teoh money) was that Chen had many associates who would track Teoh down, and, it could be easily inferred, do harm to Teoh if the loan was not repaid, the jury could have reasonably concluded that Chen had "induc[ed Teoh] in any way ... to make repayment," 18 U.S.C. § 891(5), and that this inducement "involve[d] the ... express or implicit threat of use[ ] of violence or other criminal means to cause harm to the person, reputation, or property of any person," 18 U.S.C. § 891(7). That the mantra was contemporaneous with the lending (rather than being given at some point when the loan came due) does not prevent it from being an inducement to pay the debt: one of the tools of the loan-sharking trade is to be clear at the very outset of the transaction that serious untoward consequences will result should repayment not be timely. *Cf. United States v. Palmieri*, 456 F.2d 9, 11 (2d Cir.1972) (lender told borrower "even before the loan was consummated" that the loan "had to be paid back or else"); *cf. also United States v. Dennis*, 625 F.2d 782, 799–800 (8th Cir.1980) ("The reputation of a loanshark or extortionist, or knowledge of his past criminal activities, impresses upon even the most courageous the potential consequences of a refusal to comply with his wishes."). With evidence of the extensive lending apparatus and extortionate collection methods, which involved a number of participants, and with at least one loan advanced to Teoh in Connecticut (*see* Tr. 455) and accompanied by this mantra, the evidence was sufficient to sustain Chen's convictions on counts one and two, and thus Chen's motion for judgment of acquittal on these counts must be denied.

■ In light of the extensive evidence of Chen's involvement in the loan-sharking enterprise and employment of threats of violence to collect debts from Teoh and others, the Court is "satisfied that competent, satisfactory and sufficient evidence in the record supports the jury verdict," and has no "concern that an innocent person may have been convicted." *Ferguson*, 246 F.3d at 134 (quotations omitted). Chen's assertion that venue was improperly established in the District of Connecticut does not warrant a new trial: (1) count one (charged to have occurred "in the District of Connecticut and elsewhere") took place in sufficient part in Connecticut[2]; and (2) as to count two (charged to have occurred "in the District of Connecticut"), at least one use of extortionate means against Teoh (the use of the mantra when lending Teoh money) took place in Connecticut during the time period charged in the indictment. Chen's remaining two arguments for a new trial (concerning the introduction of codefendant Sun's post-arrest statement and alleged grand jury misconduct) were addressed in separate rulings and found not to warrant Rule 33 relief. Thus, Chen's alternative motion for a new trial must be denied.

### 2. Sun

■ The evidence at trial provided a reasonable basis for the jury to conclude that Sun was an active participant in the loan-sharking operation and was fully aware of the nature of the enterprise: in

---

**2.** *See* 18 U.S.C. § 3237(a) ("[A]ny offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed ...."); *United States v. Smith*, 198 F.3d 377, 382 (2d Cir.1999).

addition to Lin's testimony of his conversations with Sun and the transcript of the recorded conversations between Lin and Sun in which Sun explained the operation of the loan-sharking business, FBI agent Peter Hsieh testified that during a post-arrest statement, Sun "said that [debtors] would be verbally threatened and in one case aggressive and hostile body language would be used." Tr. 142. Sun's argument that his acquittal on count three (concerning debtor Hsu) calls into question his conspiracy conviction on count one (because the conspiracy count concerns the extortionate collection of extensions of credit from "Inguan Teoh, *Chin Shen Hsu,* and other debtors," Count One (emphasis added)) is unsupported by the evidence at trial. The jury's conclusion that the Government had not met its burden of proving Sun's guilt in using extortionate means or aiding and abetting Chen's use of extortionate means to collect Hsu's debt does not undermine the fact that the trial evidence adequately supported the jury's conclusion that Sun conspired to use extortionate means against other debtors, which is an entirely separate offense with separate elements. *See United States v. Palmieri,* 456 F.2d 9 (2d Cir.1972) (upholding conspiracy conviction under § 894 despite acquittal on the substantive count of violating § 894 where the evidence supported the conspiracy conviction); *cf. United States v. Mulder,* 273 F.3d 91, 114 (2d Cir.2001) ("the jury's decision to acquit Carnes on the substantive Defoe count does not indicate that it found he did not conspire to extort Defoe because the elements of the two crimes are different").

■ The evidence was also sufficient to support a finding that Sun aided and abetted Chen's use of extortionate means to collect Teoh's debts, as the jury heard evidence (including Sun's own incriminating statements) that he drove Chen and others to a Teoh's restaurant in New York, where Chen stationed people at the door to prevent Teoh from leaving and accosted Teoh about his lack of timely payment. Tr. 518–521 (threatening behavior); 522 (Sun driving car). While this particular collection effort took place in New York, the Chen/Teoh borrowing relationship was ongoing, with a number of loans over a number of years, so Sun's assistance in helping Chen threaten Teoh in New York could reasonably have been found by the jury to have been yet another instance of bolstering Chen's menacing reputation, all acting to assist in the future collection of loans in Connecticut. Sun was undoubtedly aware of the nature and consequence of his involvement in the restaurant incident, as he admitted in a post-arrest statement that "he was assigned to drive the getaway car" and that one of the enterprise's associates "would use very deliberate body language to compel people to pay back their loans." Tr. 116 (Agent Hsieh recounting Sun's post-arrest statement).

Sun's reliance on *United States v. Allen,* 127 F.3d 260 (2d Cir.1997), is misplaced. The Second Circuit's reversal of the 18 U.S.C. § 892 [3] conviction in *Allen* stemmed from the Government's failure to prove that "the creditor and the debtor both understand at the outset of the loan transaction that violence could result if the loan is not repaid," 127 F.3d at 263 (*citing United States v. Curcio,* 712 F.2d 1532, 1544 (2d Cir.1983)), which is a requirement peculiar to the § 892 offense. [4] Beyond the

---

**3.** Section 892 prohibits the making of an extortionate extension of credit, while § 894 (the offense for which Chen and Sun were convicted) prohibits the extortionate collection of an extension of credit.

**4.** *Curcio,* on which the *Allen* court relied for this requirement, construed the definition of "extortionate extension of credit" in § 891(6) (the making of which is prohibited by § 892) to include the creditor's contemplation of vio-

disjuncture between the evidentiary requirements of § 892 and § 894, the evidence established that Sun knew how the enterprise collected its debts and thus cannot be said to have been unaware of the means and ends employed by: (1) the conspiracy of which he was found to be a member, or (2) Chen and the others, whom Sun drove to collect the Teoh loan.

Sun's reliance on *United States v. Scotti,* 47 F.3d 1237 (2d Cir.1995), is also misplaced. Sun cites *Scotti* for the proposition that "the defendant must play some role in the extortion itself to incur liability under 18 U.S.C. § 894(a)(1); merely being the knowing instrumentality through which the loanshark's collection tactics could bear fruit ... is not sufficient." *Id.* at 1243–1244 (internal quotations omitted). The *Scotti* court did not, however, foreclose the use of an aiding and abetting theory[5] in connection with § 894: the court found only that the evidence was insufficient to show that the defendant acted as a principal, and while noting that the evidence may have been sufficient for conviction on an aiding and abetting theory, the Second Circuit concluded that the trial court's merging of the two theories in one instruction required a new trial:

> [I]f a separate aiding and abetting count were charged and we were to find the evidence sufficient to convict Rodriguez on that theory (an issue we do not decide on this appeal), a reversal of the district court's grant of a new trial on Count Seven would be in order. * * * The problem in this case is that, given the form of the indictment, we do not know whether the jury found Rodriguez guilty as a principal or an aider and abettor. The jury merely returned a

general verdict of guilty on Count Seven, and thus did not indicate on what theory its verdict rested. Although Rodriguez may be punished as a principal if convicted as an aider and abettor ... the distinction between the two theories of liability is crucial in this case. [B]ecause aiding and abetting requires proof of Rodriguez's purpose to bring about the crime, it is more difficult to prove than principal liability under § 894(a)(1).

*Id.* at 1246–1247. Here, the jury instructions as to defendant Sun specifically noted that aiding and abetting was the basis of the Government's theory as to count two for Sun, *see* Jury Instructions [Doc. # 67] at 37–39, and while the charge did not specifically state that Sun could not also be convicted as a principal, the instructions on principal liability avoided the problem fatal to the *Scotti* trial court's charge by instructing:

> [A] defendant must play some role in the extortion itself; that is, he may not be found guilty if he merely performs acts that he knows will facilitate a debtor's repayment of a debt that is being collected by others who are using extortionate means. In other words, a defendant must be proved to have played some role in the extortion itself, not just facilitating collection of funds knowing extortion is afoot.

Jury Instructions [Doc. # 67] at 34–35.

As with defendant Chen's convictions on counts one and two, the evidence before the jury of Sun's purposeful and knowing involvement in the extensive loan-sharking enterprise and the enterprise's concomi-

---

lence in the future collection of the extension of credit.

**5.** *See* 18 U.S.C. § 2(a) ("Whoever commits an offense against the United States or aids,

abets, counsels, commands, induces or procures its commission, is punishable as a principal.").

tant employment of threats of violence to collect debts from Teoh and others was sufficient to support the jury's guilty verdict and constituted "competent, satisfactory and sufficient evidence in the record support[ing] the jury verdict," obviating any "concern that an innocent person may have been convicted." *Ferguson,* 246 F.3d at 134 (quotations omitted). Sun's motion for a judgment of acquittal or for a new trial must therefore be denied.

### B. Count Three [6]

Chen Shen Hsu, the owner of the Happy Beef Noodle Shop, testified that he met Chen at a bar next to the noodle shop, in New York. Tr. 686–687. At some point after their initial meeting, Hsu was told by someone at Foxwood's that Chen could lend him money. Tr. 688. He started borrowing money from Chen, in increments between $5,000 and $20,000 each time, sometimes getting the money from Chen himself and sometimes from Chen's associates. Tr. 689–690. The terms of the loans were as follows: there was an initial deduction up front (that is, if Hsu borrowed $5,000, he would only receive $4,000), and if the entire amount was not repaid in three days, more interest would accrue. Tr. 692. If Hsu began to win money while gambling, however, the loan became due immediately. Tr. 694.

Hsu did not specifically testify on direct examination that he had been threatened by Chen and on cross-examination denied any specific threats, *see* Tr. 722–727, but his testimony provided a basis for a jury to conclude that he had been placed in fear:

Q: Based upon what ... Chen told you, what did you think would happen to you if you did not pay back that loan?

[Overruled objection]

A: I'm afraid.

Q: We were talking about at the time that you couldn't pay the loan back.

A: I was very much scared. I was trying to get money, but I couldn't.

Tr. 702. Hsu's fear was so great that he considered suicide, Tr. 704 ("I was almost going to kill myself, just going to end myself like that . . . ."), and was prompted to tell Chen that the FBI had visited him, hoping that Chen would come to the noodle shop less often, Tr. 706.

■ While Chen focuses on the absence of testimony about a specific threat and correctly notes that the focus must be on the defendant's actions rather than the victim's subjective state of mind, *see United States v. Natale,* 526 F.2d 1160, 1168 (2d Cir.1975) ("it is the conduct of the defendant, not the victim's individual state of mind, to which the thrust of the statute is directed"), Hsu's profound fear, to the point of planning to commit suicide, was strong circumstantial evidence of threatening behavior of Chen and his associates. *Cf. United States v. Glenn,* 312 F.3d 58, 70 (2d Cir.2002) ("Circumstantial evidence can be as compelling as direct evidence and a conviction can rest solely on circumstantial evidence."). The jury could have reasonably inferred that Hsu's fear was grounded in part on Chen's practice of having a number of associates hover behind the debtors while they were at the gaming tables, watching the debtors and immediately collecting any winnings. Tr. 694–695. This practice was visible on the videotapes shown to the jury. Chen also told Hsu about a restaurant owner in New York who had borrowed money but had not paid it back, warning "I would do this and that" and "See, who dares not to pay me back?" Tr. 699–700. Although the story was related at a time when Hsu had

---

**6.** As noted above, Sun was acquitted on count three.

no outstanding loans from Chen (and was told by Chen in New York, not "in the District of Connecticut" where count three was charged by the grand jury as having taken place), Chen's telling of the story could have been seen by the jury as part-and-parcel of a larger, ultimately success-ful attempt to implicitly intimidate Hsu and place him in fear.

Chen's concern about converting § 894 into a status crime for which he could be convicted based on who he is rather than what he has done, *cf. United States v. Zimmitti*, 850 F.2d 869, 874 (2d Cir.1988) ("The suggestion that the jury could have inferred implicit threats from their own in-court observations of the demeanor and character of Zimmitti and Strano must be rejected. The record shows nothing of their demeanor or of any display of charac-ter in court. It does indicate that Strano was taller and heavier than the average man, but to permit from such a fact an inference that violence was implicitly threatened would suggest that it is a crime simply for a large person to be a bill collector."), is misplaced. The evidence against Chen consisted of his own words (including rhetorically asking Hsu "See, who dares not pay me back?") and actions (causing his associates to hover over debt-ors in the casino and immediately retrieve funds due).

Hsu's denials of ever having been threatened by Chen are certainly signifi-cant, and defense counsel argued their sig-

nificance to the jury during closing argu-ment, *see* Tr. 844–847. However, Hsu's denials do not *ipso facto* require a judg-ment of acquittal, as the jury could have disbelieved the denials by, for example, concluding that they are attributable to different cultural conceptions of what con-stitutes a "threat," and credited other por-tions of Hsu's testimony and/or other evi-dence of record. *See United States v. DeLutro*, 435 F.2d 255, 257 (2d Cir.1970) ("Naturally, the testimony of Horowitz at trial that he was not threatened detracted from the Government's case. * * * But the jury was not required to credit that testimony .... The jury apparently con-cluded that Horowitz was sufficiently scared at trial to deny his terror in the past. * * * [W]e reject the notion that the silencing of a victim at trial can abso-lutely eliminate the possibility of a convic-tion."); *United States v. Isaacs*, 947 F.2d 112, 114 (4th Cir.1991); *United States v. Nakaladski*, 481 F.2d 289, 297–298 (5th Cir.1973). Because the Rule 29 inquiry requires the Court to defer to " 'the jury's choice of the competing inferences that can be drawn from the evidence,' " *United States v. Griffith*, 284 F.3d 338, 348 (2d Cir.2002) (*quoting United States v. Morri-son*, 153 F.3d 34, 49 (2d Cir.1998)), the fact that a jury *could* have concluded that no threat was made is of no consequence if the evidence, when viewed with every doubt resolved in the verdict's favor, can support the verdict.[7] *See also United*

---

**7.** As the Supreme Court set out in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the Court on a Rule 29 inquiry does not "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt."

> Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable

doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reason-able inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judi-cial review all of the evidence is to be

States v. Matthews, 20 F.3d 538, 548 (2d Cir.1994) ("Pieces of evidence must be viewed not in isolation but in conjunction.") (citations omitted). When analyzed under the stringent standards of Rule 29, Chen's motion for acquittal on count three must be denied.

■ Chen's alternative request for a new trial on this count argues that the count was vague and that defense counsel was not aware until cross-examination what threatening behavior comprised the Government's theory of count three.[8] However, the indictment as written explicitly provided that Chen was alleged to have used extortionate means to collect extensions of credit from Hsu, and the indictment provided a location (the District of Connecticut) and a time frame.[9] As the Court concluded in denying Chen's pretrial motion for a bill of particulars, this information was sufficient. See, e.g., United States v. Gottlieb, 493 F.2d 987, 994 (2d Cir.1974) ("The government was not required to disclose its evidence in advance of trial. It was sufficient that Gottlieb was apprised that the theory of the government's case would be that he fraudulently misrepresented himself as a member of the National Guard to avoid being drafted and that this was done in conspiracy with Harry Coogan.") (citations omitted); United States v. Davidoff, 845 F.2d 1151, 1154 (2d Cir.1988) ("The prosecution need not particularize all of its evidence.") (citing Gottlieb). Moreover, Chen's counsel was given a full opportunity to cross examine Hsu, and was able to elicit probative denials by Hsu of ever having been threatened by Chen or his associates. Inasmuch as the Court concludes that "competent, satisfactory and sufficient evidence in the record supports the jury verdict," and has no "concern that an innocent person may have been convicted," Ferguson, 246 F.3d at 134 (quotations omitted), Chen's motion for a new trial on count three must be denied, as well.

## IV. Conclusion

For the reasons set out above, the defendants' motions [Docs.##74 & 97 and the accompanying oral motions] are DE-

---

considered in the light most favorable to the prosecution.
*Id.* at 318–319, 99 S.Ct. 2781 (citations, footnotes and internal quotations omitted).

8. Chen's other arguments for a new trial are the same as those advanced as to counts one and two and addressed above. The claim that the count three conduct did not occur "in the District of Connecticut" as charged by the grand jury is unavailing, as the Hsu's dealings with Chen were centered in Connecticut (where Hsu gambled at Foxwoods) and the menacing Chen associates hovering over the gaming tables as Hsu gambled were obviously in Connecticut.

9. Count Three reads:
From in or about January 1999 through in or about December 2001, the exact dates unknown to the Grand Jury, in the district of Connecticut, [the defendants], together with others unknown to the Grand Jury, did knowingly participate in and cause the use of extortionate means, as defined in Section 891(7) of Title 18, United States Code, to collect and attempt to collect extensions of credit, that is, approximately hundreds of thousands of dollars in principal and interest, from Chin Shen Hsu, the debtor, and to punish the debtor and others for the nonpayment thereof, in that those defendants did use and expressly and implicitly threaten the use of violence and other criminal means to cause harm to the person, reputation, and property of the debtor and others. All in violation of Section 894(a) of Title 18, United States Code.

NIED.[10]

IT IS SO ORDERED.

---

10. Sun's motion to adopt relevant arguments  of Chen [Doc. # 97–3] is GRANTED.