**UNITED STATES of America,**
**Appellee,**

v.

**Steven CHEN and Gong Chai Sun,**
**Defendants–Appellants.**

**Docket Nos. 02–1740L, 02–1759CON.**

United States Court of Appeals,
Second Circuit.

Argued: March 30, 2004.

Decided: Aug. 5, 2004.

**154**

Jeremiah Donovan, Old Saybrook, CT, for Defendant–Appellant Steven Chen.

Michael S. Hillis, Dombroski, Knapsack & Hillis LLC, New Haven, CT, for Defendant–Appellant Gong Chai Sun.

Stephen B. Reynolds, Assistant United States Attorney, Hartford, CT (Kevin J. O'Connor, United States Attorney, William J. Nardini, on the brief), for Appellee.

Before: FEINBERG, CABRANES, and POOLER, Circuit Judges.

FEINBERG, Circuit Judge.

Defendants-appellants Steven Chen and Gong Chai Sun ran a loansharking operation out of Foxwoods Casino in Mashantucket, Connecticut. Most of their "clients" were Asian gamblers at the casino and Asian business owners with businesses in Manhattan, Queens and New Jersey. In January 2002, a grand jury returned an indictment against Chen and Sun, charging them each with one count of conspiracy to use extortionate means to collect and attempt to collect extensions of credit,[1] in violation of 18 U.S.C. § 894(a), and two counts of using extortionate means to collect and attempt to collect extensions of credit, also in violation of § 894(a). In August 2002, a jury convicted Chen on all three counts of the indictment; Sun was convicted on counts one and two, but was acquitted on count three.[2] Following the close of the government's case, Chen and Sun moved for acquittal pursuant to Fed.R.Crim.P. 29. After their convictions, they moved again for acquittal or for a new trial pursuant to Fed. R. Crim P. 33. The United States District Court for the District of Connecticut (Janet Bond Arterton, J.), in a September 2003 opinion, denied the motions. Chen and Sun now appeal, each claiming that the evidence at trial was insufficient to support his substantive convictions. Sun also argues that the evidence underlying his conspiracy conviction was insufficient. Finally, Chen claims that the district court abused its discretion in refusing to order the government to produce a bill of particulars more specifically defining each alleged threat made to collect extensions of credit and each alleged act of violence associated with each threat.

## I. Background

### A. The Indictment

As described above, the indictment handed down against Chen and Sun alleged, as against each, one count of conspiracy to violate 18 U.S.C. § 894(a)(1) and two counts of substantive violations of that statute. Section 894(a)(1) prohibits "the use of any extortionate means ... to collect or attempt to collect any extension of credit." "Extortionate means" are "any

---

1. An "extension of credit" includes what would ordinarily be called a loan. See 18 U.S.C. § 891(1).

2. The district court sentenced Chen to 57 months imprisonment and Sun to 33 months imprisonment. These sentences are within the guidelines range proscribed by U.S.S.G. § 2E2.1 (collection of credit by extortionate means) and U.S.S.G. § 2X1.1 (conspiracy).

means which involve[ ] the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person." Id. § 891(7). "To collect an extension of credit means to induce in any way any person to make repayment thereof." Id. § 891(5).

Count one of the indictment, the conspiracy charge, alleged a conspiracy to use extortionate means to collect and attempt to collect extensions of credit "from Inguan Teoh, Chin Shen Hsu, and other debtors." It alleged that this conspiracy took place between about January 1999 and about December 2001 "in the District of Connecticut and elsewhere." Counts two and three of the indictment, the substantive charges, alleged that the extortionate collection and attempted collection of extensions of credit took place between about July 1999 and February 2001 on count two and between about January 1999 and December 2001 on count three, but that the alleged extensions of credit took place on both counts only "in the District of Connecticut." More specifically, count two alleged that Chen and Sun "together with others unknown to the Grand Jury" used extortionate means to collect extensions of credit from a borrower named Inguan Teoh by "expressly and implicitly threaten[ing] the use of violence and other criminal means to cause harm to" Teoh. Count three similarly alleged that Chen and Sun, along with others, used extortionate means to collect extensions of credit from a borrower by the name of Chin Shen Hsu.

### B. Evidence Adduced at Trial

1. The loansharking conspiracy (count one)

During the course of the five-day jury trial, the government presented evidence of Chen and Sun's loansharking scheme to the jury through, among other things, the testimony of FBI agents and Kun Lin, a cooperating witness, tape-recorded conversations between Lin and Chen and Sun, and video tapes of the casino floor at Foxwoods. The evidence generally showed that Chen and Sun operated out of Foxwoods Casino, where they made high interest loans to a primarily Asian clientele. Chen and Sun usually charged their borrowers about 10 percent interest on their loans; the loans usually had to be paid back within three to seven days. They often let borrowers purchase "extensions" on their loans for another 10 percent. Chen and Sun and a few other confederates would also roam the casino, sometimes gambling themselves, but also watching those clients who had borrowed money from them. It seemed to be their general practice that if a borrower won while gambling, his debt would be collected on the spot.

Chen and Sun's operation was extensive. Chen acknowledged that the business was "exhausting" because it required him to be at the casino almost daily for about two years. Allan Phillips, an expert witness from the FBI's Racketeering Records Analysis Unit, testified that his analysis of Chen and Sun's ledger books revealed that Chen and Sun had provided loans to approximately 138 different borrowers, in the total amount of $396,000. Phillips stated that the annual interest rates on the various loans ranged from zero to 4,055 percent. Chen and Sun also seemed interested in expanding their business. When Chen and Sun met with cooperating witness Lin in November and December of 1999 and then again in July 2000, they encouraged Lin to invest $100,000 in the business so that they could control loansharking at two casinos.

The evidence also showed that Chen and Sun would use threats in order to ensure

payments of outstanding loans. Chen bragged to Lin that he and Sun had police officers who collected debts for them, and showed Lin a police badge to prove his connections. Chen claimed that when the owner of a Malaysian restaurant did not pay him a debt, Chen sent the police to beat him up. Chen also claimed that he had the restaurant shut down. In addition, Sun admitted to FBI agents after his arrest that he and his confederates would verbally threaten borrowers who had not paid back their loans. He indicated that one of the members of his loansharking group, Ah–Qiang, "would use very deliberate body language to compel people to pay back their loans."

2. The substantive count involving Inguan Teoh (count two)

Both victims named in the indictment— Inguan Teoh and Chin Shen Hsu—testified at trial. Inguan Teoh was a Malaysian business man who met Steven Chen through a mutual friend. Teoh owned two restaurants—the Melaka Restaurant in Flushing, Queens and another in New Jersey. Teoh testified that in about July 1999, his restaurant was running at a loss. Because he could not obtain a loan from a bank, Teoh decided to travel to Foxwoods to approach Chen for a loan. Teoh asked Chen for a $10,000 loan, but Chen consented to lend him only $5,000. Chen told Teoh that the interest on the loan would be 10 percent, or $500, per week. Chen took the first week's interest out of the loan, giving Teoh $4,500. Additionally, Chen explained that if Teoh wanted an extension on the loan, he could pay another $500 for every week of extension. At the time Chen gave Teoh the loan, Chen warned Teoh that if he did not pay back the money, Chen would "find ways and means to look for [him] in order to get the money." Chen also told Teoh that he should not run away with the money be-

cause he had "about 60 people" under him who would search out Teoh to get him to pay. Chen said that he had "police personnel" working for him who helped him collect loans. Teoh understood that if he did not pay back the loan, he could get "beaten up."

Teoh paid back the loan and then proceeded to take out three more loans from Chen. The second loan was in the amount of $10,000, with the same 10 percent interest per week and extension arrangement as the first loan. Teoh, who was in New York, called Chen at Foxwoods to get the loan. As with the first loan, Chen told Teoh over the phone that he had to pay back the loan and could not hide from Chen and his people. About one or two days later, defendant-appellant Sun delivered the money to Teoh in Flushing. Teoh paid back the second loan, and about two weeks later took out a third loan for $10,000 under the same terms as the second loan. Once again, Teoh called Chen at Foxwoods, and Chen had the money delivered to Teoh in New York. Chen again warned Teoh over the telephone that if he did not pay the loan back, Chen would send people to look for him. Teoh paid the third loan, and then, in September 1999, took out a fourth loan in the amount of $10,000, under the same terms as the second and third loans. Teoh called Chen in Connecticut to initiate the loan, and Chen and one of his confederates, Xiao Wu, then delivered the money to Teoh in Flushing. At the time Chen handed Teoh the money, he gave him the usual warning that if he ran away with the money, Chen's people would hunt him down and find him.

Teoh was unable to pay back the fourth loan. After he had not repaid for about a week, Chen called Teoh to demand payment. Chen insisted that Teoh come and meet him, but Teoh lied and told Chen he was out of town. After about two more

weeks, Chen called Teoh again. During that phone conversation, Teoh managed to strike a deal with Chen whereby Teoh would borrow another $5,000 to cover the interest he already owed to Chen. A few weeks later, when Teoh still had not made any payments, Chen and Xiao Wu called Teoh. They threatened to send people to his restaurant to harass customers. Wu told Teoh that if the money was not paid, they would blow up or close his restaurant. Teoh testified that he also heard Chen in the background yelling that if Teoh did not pay, "we are going to blow up his restaurant." Thereafter, Chen sent people to Teoh's restaurants to find him, at which point Teoh contacted the New York City Police Department. The police then set up a controlled payment at the Melaka restaurant. At the behest of the police, Teoh called Chen to discuss the loan and recorded their conversation. During the conversation, Chen berated Teoh for not contacting him, and then told Teoh to provide a date by which he would pay. He also told Teoh, "You can't delay it forever," and reminded him, "We are capable of doing anything. You have to understand our profession." Chen then insisted on coming to meet Teoh at the Melaka. Chen and Xiao Wu arrived at the restaurant about 20 minutes later and came inside; two other associates of Chen stationed themselves at the front entrance. Chen asked Teoh for the money, and Teoh handed him an envelope containing a $50 bill. When Chen saw the bill, he threw the envelope back at Teoh and asked, "What the hell are you doing, you ask me to come without paying me?" At that point, a New York City police detective who had been posing as a customer in the restaurant arrested Chen and Wu. The two men stationed outside the restaurant fled in a car. The car was later stopped, and the men, including defendant-appellant Sun, were arrested. Sun later told detectives that he

was involved in an incident at a Malaysian restaurant in New York City in which he was assigned to drive the getaway car. About one month later, Teoh had to close the Melaka restaurant.

Approximately two years after the incident at the restaurant, Teoh ran into Chen at a bakery in Flushing. Chen confronted him and asked why he went to the police for help. Chen told Teoh, "I know where your wife work[s]. You think I cannot do anything [to] you? I'm going to." He then demanded Teoh repay his loan. Teoh told him he could not pay it back in one lump sum, but would pay it back little by little. Chen then grabbed Teoh's hand and squeezed it until it hurt. Teoh pulled away and told Chen he would go to the precinct for help.

3. The substantive count involving Chin Shen Hsu (count three)

Chin Shen Hsu testified that he first met Steven Chen at a bar next to Hsu's noodle shop. After he lost money gambling at Foxwoods, he started to take out loans from Chen, in amounts ranging from $5,000 to $20,000. Generally, Chen would require the loan to be paid back within three days, with 10 percent interest to be paid for every three days the loan was not repaid. Chen would also initially deduct 10 or 20 percent from the loan up front, so that if he loaned Hsu $5,000, he would actually give him only $4,000. Notwithstanding the three-day loan period, if Hsu won while he was gambling, he would be required to pay back the loan immediately. Chen and his associates would watch Hsu on the casino floor to ensure immediate repayment, but Hsu testified that they never threatened him.

Initially, Hsu paid back all of his loans and was on good terms with Chen. Chen would sometimes visit him at his noodle shop. On one occasion, when Hsu had no

outstanding loans from Chen, Chen told Hsu that because the owner of the Malaysian restaurant had not paid him back, he was going to have his restaurant closed down. Chen said, "See, who dares not . . . pay me back?"

Eventually, Hsu took a $40,000 loan from Chen that he could not repay. Hsu ran away to Taiwan, where he borrowed some money from his parents. Hsu testified that he was very scared because he could not pay the loan back, but he also testified that Chen never said anything to him about what would happen if he could not pay back the loan. Hsu called Chen from Taiwan and told him that he did not know what to do and was going to kill himself. Chen told Hsu not to kill himself and encouraged Hsu to come back to the United States. Hsu returned. Chen allowed him to pay off the principal he owed little by little and did not require him to repay the interest.

## II. Discussion

On appeal, defendant-appellant Chen does not challenge his conspiracy conviction (count one), but does seek reversal of his conviction on counts two and three of the indictment. With respect to count two, involving the alleged threats against Inguan Teoh, Chen concedes that the confrontation at the Melaka restaurant and the incident at the Flushing bakery are "extortionate means" of collecting extensions of credit under 18 U.S.C. § 894. However, he claims that because these incidents and the loans associated with them took place in New York rather than in Connecticut, the link between these actions and the District of Connecticut was insufficient to establish venue in the Connecticut district court. Chen also argues, with respect to both counts two and three,

that evidence of a threat made at a time when a loan was not outstanding or at the time an extension of credit was made does not fall within the purview of 18 U.S.C. § 894, which requires a threat to occur contemporaneously with the collection of a loan.[3] In addition, Chen contends that the evidence is insufficient to show any contemporaneous threats were made. Finally, Chen claims that he was prejudiced by the district court's failure to require the government to provide a bill of particulars because he was not given adequate notice of what "threats" the government was alleging he made against Chin Shen Hsu.

Defendant-appellant Sun, who was acquitted on count three, seeks to set aside his convictions on counts one and two of the indictment because they were not supported by sufficient evidence. Sun argues that the evidence was insufficient to prove that he knowingly participated in the loan-sharking activities associated with Teoh. Sun also claims that his acquittal on count three is inconsistent with his conviction on the conspiracy count.

■■■ We review Chen and Sun's contentions that the district court erred in denying their respective motions for acquittal by determining whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Thorn*, 317 F.3d 107, 132 (2d Cir.2003). In doing so, we consider the evidence presented at trial in the light most favorable to the government, crediting all inferences in the government's favor. See Thorn, 317 F.3d at 132; *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir.2003). Defendants' burden is therefore a heavy one, since a

---

**3.** Chen argues that a threat made at the time credit was extended falls under 18 U.S.C.

§ 892, not § 894. Section 892 prohibits "extortionate extensions of credit."

court may grant a judgment of acquittal only "if the evidence that the defendant committed the crime alleged [was] nonexistent or ... meager." *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir.1999) (internal citation and quotation marks omitted).

A. Chen

1. Whether venue was proper on substantive counts two and three [4]

 The Sixth Amendment establishes that a federal defendant shall be tried in the "district wherein the crime shall have been committed, which district shall have been previously ascertained by law." U.S. Const. amend. VI. Moreover, Fed.R.Crim.P. 18 provides that "[u]nless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed." Where a federal statute defining an offense does not explicitly indicate where a criminal act is deemed to have been committed, the site of a charged offense "must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *United States v. Cabrales*, 524 U.S. 1, 5, 118 S.Ct. 1772, 141 L.Ed.2d 1 (1998) (internal citation and quotation marks omitted); *United States v. Svoboda*, 347 F.3d 471, 482–83 (2d Cir. 2003). Moreover, "when a defendant is charged in more than one count, venue must be proper with respect to each count." *United States v. Smith*, 198 F.3d 377, 382 (2d Cir.1999) (hereinafter *"United States v. Benny Smith"* or *"Benny Smith"*) (internal citation and quotation marks omitted). Nevertheless, venue is

not an element of the crime; the government therefore bears the burden of proving venue only by a preponderance of the evidence. *Id.*

 Chen argues that with respect to the use of extortionate means to collect the debt from Inguan Teoh (count two), the only such acts—the incidents at the Melaka restaurant and the Flushing bakery— took place in the Eastern District of New York, not Connecticut and that the comments made to Chin Shen Hsu (count three) about the Melaka restaurant, if they can be read as an extortionate act at all, also took place in the Eastern District of New York. The government submits that under *United States v. Benny Smith*, 198 F.3d at 377, all of the loans and the threats made in connection with them constitute a continuing course of conduct, so that threats made on previous loans in Connecticut provide a sufficient nexus to establish venue in the District of Connecticut, even if the actual extortionate acts took place elsewhere.

In *Benny Smith*, the question was whether defendant's acts in violation of the Hobbs Act and 18 U.S.C. § 894 in the Eastern District of New York were sufficient to establish venue in the Southern District of New York, where the extensions of credit were made by telephone by one of defendant's associates in the Southern District.[5] The majority concluded there that both the Hobbs Act and loan-sharking offenses were "not unitary but instead spanned space or time so that section 3237(a) applied." 198 F.3d at 385 (internal quotations omitted). That section provides, "[e]xcept as otherwise ex-

---

4. As indicated above, Chen does not challenge his conspiracy conviction (count one).

5. Chen, in his brief, argues that the "government misconstrued [*Benny*] *Smith*" as a § 894 case, when it was a Hobbs Act case.

We disagree: Although *Benny Smith* does deal with Hobbs Act violations, it also clearly deals with venue and continuing offenses within the context of § 894 violations. See *Benny Smith*, 198 F.3d at 385.

pressly provided ... any offense against the United States begun in one district and completed in another, or committed in more than one district, may be ... prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a). The majority concluded that the government met its burden of proving venue in the Southern District by a preponderance of the evidence because the evidence established that the calls made by the defendant's associate from Manhattan were "integral parts of the extortionate collection process." 198 F.3d at 385.

■ Our case is an easier one than *Benny Smith.* Unlike the situation in *Benny Smith,* we do not have to decide whether the actions of an associate of the defendant, rather than the actions of the defendant himself, establish venue. Nor do we have to consider, as the court did in *Benny Smith,* whether a pattern of extending loans, the threats associated with their provision, and the effort to collect constitute a "scheme" that justifies venue in more than one "location." Id. at 385. In our case, we need only look at the one loan—the fourth loan to Teoh—associated with the ultimate extortionate acts. With respect to this loan, Teoh called Chen at Foxwoods in Connecticut to ask for the loan; during that phone call, Chen promised Teoh the money and set up delivery; Chen entered the loan into his ledger book, which was kept in Connecticut; Chen delivered the money to Teoh; and Chen then used extortionate means to attempt to collect the loan. Although the extortionate means themselves took place outside Connecticut, we believe that venue here is not solely established by the place where the extortionate means were used. Instead, so long as the extortionate collection charged in count two was "begun, continued, or completed" in the District of

Connecticut, venue in the District of Connecticut is proper. 18 U.S.C. § 3237(a). In this context, we believe the "beginning" of an extortionate collection for venue purposes may be the initiation of the loan. A phone call made by Teoh to Chen in the District of Connecticut to initiate the loan and the ensuing conversation are, as the majority in *Benny Smith* put it, "integral" to the ultimate extortionate collection. 198 F.3d at 385. The government provided sufficient evidence to prove by a preponderance that the extortionate acts that ultimately took place at the Melaka restaurant and then at the Flushing bakery began with the agreement in Connecticut to make the loan. Venue in the District of Connecticut was therefore properly established.

With respect to count three, Chen argues that at least one of the alleged extortionate acts—the comments he made to Hsu about the Melaka restaurant—took place in New York and therefore venue in the District of Connecticut is inappropriate. However, we need not decide whether these comments established venue because, as explained below, the record evidence can sustain a § 894 conviction against Chen without reliance on the Melaka conversation with Hsu.

2. Whether the evidence was sufficient to show extortionate means were used to collect extensions of credit

■ Section 894(a)(1) specifically prohibits the use of any extortionate means "to collect or attempt to collect any extension of credit." Thus, the crime proscribed by § 894(a)(1) requires the government to prove that: (1) there was principal or interest outstanding on the loans; (2) the defendants actually collected or attempted to collect sums due; and (3) the defendants employed extortionate means to collect the same. *United States v. Na-*

*tale,* 526 F.2d 1160, 1166 (2d Cir.1975). In other words, a case dealing with a § 894 offense must involve some affirmative act directed towards collection of a loan to substantiate the charge. See *United States v. Scotti,* 47 F.3d 1237, 1243 (2d Cir.1995).

■ This does not mean that, to constitute a violation of § 894, an extortionate threat is necessary at the time of each and every collection. In *United States v. Smith,* 464 F.2d 1129, 1134 (2d Cir.1972) (hereinafter *"United States v. Smith"* or *"Smith"*), we decided whether threats made to collect a loan before the enactment of § 894 could be used to establish that post-enactment payments were motivated by the use of extortionate means to collect an extension of credit in violation of § 894. In that case, we specifically "refuse[d] to read [§] 894 as requiring that each collection be accompanied by an overt threat." *Id.* In *Smith,* the victims took out a loan that was to be repaid weekly. Before enactment of § 894, the defendants threatened to burn down the victims' home and business if they did not repay the loan. The defendants also threatened to harm the victims' child. The victims went into hiding, but continued to repay the loan into the post-enactment period. We held that given the charge was one for conspiracy, once it was established that the loan

was made, there was "no difficulty in attributing the post-enactment payments to the initial arrangement which necessitated a continuing relationship. The subsequent collections cannot be viewed in isolation as separate or unrelated transactions." *Id.* at 1135 (citation omitted).

As already indicated, Chen admits that the incidents at the Melaka restaurant and the Flushing bakery were "extortionate acts," and we have decided that venue was properly established for the count two charges related to Teoh. Therefore, we need not consider further whether the threats Chen made when he extended the loans to Teoh violated § 894. However, we must determine whether the conduct alleged in count three of the indictment (involving Hsu) constituted a § 894 violation. Specifically, we must consider whether (1) the comments Chen made to Hsu about the Melaka restaurant and (2) the "hovering" behind Hsu to make him repay his debts at the gambling tables were extortionate acts used to collect extensions of credit from Hsu.

■ With respect to the Melaka restaurant comments, Chen argues that because there was no outstanding loan at the time he made those comments, there can be no § 894 violation.[6] The government contends, however, that the series of loans

---

**6.** Chen also relies on our decision in *United States v. Allen,* 127 F.3d 260 (2d Cir.1997) and the decision of the district court in New Jersey in *United States v. Lore,* 4 F.Supp.2d 352 (D.N.J.1998) to argue that any threats made upon extension of the loan are covered by 18 U.S.C. § 892, which prohibits extortionate extensions of credit, and do not fall within the purview of § 894, which covers the use of extortionate means to collect the loans. Chen therefore implies that any threats made at the time he extended the loans to Teoh and Hsu cannot be taken into consideration here. However, the threats made at the time the various loans were made need not be considered in deciding this case. Chen acknowl-

edges that the threats he made to Teoh to collect on the fourth loan were threats made to collect that loan. Those threats by themselves are sufficient to sustain a conviction under § 894 on count two. As for the comments Chen made to Hsu about the Melaka restaurant, as we discuss herein, the key issue is whether there was an outstanding loan at the time the comments were made. With respect to the "hovering," the government's allegations were that such threatening behavior occurred precisely in order to collect loans. This behavior therefore also clearly falls within the purview of § 894. Thus, neither *Allen,* which dealt with § 892 (not § 894), nor *Lore* is helpful.

that Hsu took from Chen must be considered a continuing violation, or as the district court put it, "as part-and-parcel of a larger, ultimately successful attempt to implicitly intimidate Hsu and place him in fear." We need not address the Melaka restaurant comments issue because we agree with the government's argument that the "hovering" of Chen and his associates behind Hsu at the gambling table constitutes use of extortionate means to collect on a loan.

Because Hsu had loans outstanding when the "hovering" occurred, if any rational juror could find that such hovering constituted a threat, Chen's § 894 conviction on count three could be sustained. Chen argues that because Hsu testified that he was not threatened, no rational juror could so find. Nevertheless, as the district court pointed out, Hsu's denials do not "*ipso facto* require a judgment of acquittal, as the jury could have disbelieved the denials." *United States v. Chen*, 283 F.Supp.2d 664, 672 (D.Conn.2003). The jury saw videotape of the "hovering" behavior,[7] and Hsu testified that Chen and his associates stood behind him at the gambling tables and made him pay immediately upon winning, even though he may have just taken out the loan and it was not yet due for 72 hours. Given that Hsu testified that after the FBI contacted him, he went and told Chen because he "wanted to please him," the jury may have concluded that Hsu's denials were also meant to protect or "please" Chen. Moreover, based upon Hsu's testimony that he had been considering suicide, the jury could have inferred that Hsu profoundly feared Chen and his associates and found them threatening. Taking all of the evidence and inferences therefrom in the light most favorable to the government, we conclude that the evidence was sufficient to find that the behavior of Chen and his associates to make Hsu pay back his loans immediately after winning at the gambling tables constituted a violation of § 894.

3. Whether the district court abused its discretion in denying a bill of particulars

In the district court, Chen requested that the government issue a bill of particulars as to (1) the date and place of the extensions of credit alleged in the indictment; (2) the date and place in which the defendants "did use and implicitly threaten the use of violence and other criminal means to cause harm to the person, reputation, and property of the debtor and others"; (3) the specific acts of violence, the specific threat of violence, the specific use of "other criminal means," and the specific threat of use of "other criminal means," that are alleged; and (4) the identity of the "others" whose persons, reputations, and properties the indictment alleges were harmed or threatened. The district court ordered the government to produce a bill of particulars as to the fourth requested category, but denied the motion in all other respects. Chen claims he was prejudiced by this ruling.

We review for abuse of discretion the district court's denial of most of Chen's motion for a bill of particulars.

---

7. At oral argument, Sun's attorney stated his belief that the videotape evidence was admitted only on the conspiracy count, but a review of the record reveals that this statement is incorrect. No special instruction was given with respect to the video, and the government was allowed to argue in its summation that Hsu's testimony about the "hovering" and the videotape corroborated each other. In any event, this claim was not presented to us in any of the briefs. See *Sioson v. Knights of Columbus*, 303 F.3d 458, 460 (2d Cir.2002) (per curiam) (the court does not ordinarily consider issues not adequately raised in an opening brief).

*United States v. Walsh,* 194 F.3d 37, 47 (2d Cir.1999); *United States v. Barnes,* 158 F.3d 662, 665–66 (2d Cir.1998). "A bill of particulars is required 'only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused.'" Walsh, 194 F.3d at 47 (quoting *United States v. Torres,* 901 F.2d 205, 234 (2d Cir.1990)). Moreover, "a bill of particulars is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means." *Id.*

■ The indictment in this case included the nature of the charges and provided a time frame and location in which the crimes were alleged to have taken place. Moreover, extensive discovery furnished defendants with significant insight into the government's case: counsel for defendants were given various FBI reports of interviews; grand jury testimony of witnesses; and the recordings and transcripts from the taped conversations that were eventually presented as evidence at trial. Finally, the government distilled its case even further in the course of the prolonged oral argument with respect to Chen's motion for a bill of particulars and again during a colloquy preceding Chen's cross-examination of Hsu.

Chen contends that he did not receive adequate notice of the alleged acts of extortion because of the long period of time alleged for each substantive count. However, by the time Chen was called upon to cross-examine the government's witnesses, it was clear not only that the government was alleging several acts of extortion within the relevant time period, but also what those acts were. Indeed, Chen's counsel was given a full opportunity to cross-examine both Teoh and Hsu, and even elicited from Hsu denials that supported the defense's position. In these circumstances, we cannot hold that Chen was unfairly surprised at trial. See *Barnes,* 158 F.3d at 665–66. The district court therefore did not abuse its discretion in denying Chen a bill of particulars specifying the exact time and place of each alleged act associated with each offense identified in the indictment.

## B. Sun

### 1. Whether the evidence was sufficient to convict Sun of participation in the loansharking operation

■ Sun argues that the evidence presented at trial is not sufficient to show his "knowing" participation in the acts of extortion against Teoh alleged in count two because the government presented no evidence that Sun actually threatened anyone. In *United States v. Scotti,* 47 F.3d at 1243, we acknowledged that the "substantive offense of § 894(a)(1) requires that the accused participate in the extortion by some affirmative act." Thus, we held that in order to incur liability under § 894(a)(1), "the defendant must play some role in the extortion itself," rather than "merely facilitate the collection of funds knowing extortion is afoot." *Id.* Applying that test, a rational juror could conclude from the evidence in this case that Sun did more than merely "facilitate" the collection of funds. The jury heard conversations between Sun and cooperating witness Lin discussing the collection of debts and Sun admitted to the FBI that he and his associates used threats to collect debts. In addition, Sun admitted to the FBI that he was "involved" in the incident at the Melaka and drove the "getaway" car. Sun was arrested in the car after the confrontation at the Melaka. The jury clearly could have inferred from this evidence that Sun actively and knowingly participated in the extortionate attempt to collect the debt from Teoh. See Benny Smith, 198 F.3d at 386.

2. Whether acquittal on count three requires acquittal on count one, the conspiracy count

■■■■ Sun also contends that his acquittal on count three—the extortionate collection of debts from Chin Shen Hsu—is inconsistent with his conviction on count one, the conspiracy count. However, we have recognized that as a matter of law, "acquittal on a substantive charge does not prevent a conviction for a conspiracy to commit the offense substantively charged unless the necessary proof on the substantive charge is identical [to] that required to convict on the conspiracy count." *United States v. Palmieri,* 456 F.2d 9, 12 (2d Cir.1972) (internal citation and quotation marks omitted). Here, even if the jury believed Sun was not involved in the substantive extortionate collection from Hsu, the conspiracy charge alleged extortionate collection from "Inguan Teoh, Chin Shen Hsu, and other debtors." The jury found Sun guilty of extortionate collection from Teoh and could have found, based on Sun's admission that he and his associates used threats to collect on their loans, that he used extortionate means against "other debtors" as well. The proof required to convict on the conspiracy count was therefore not identical to the proof required on the substantive count against Hsu. There is no inconsistency in the verdict mandating acquittal.

### III. Conclusion

In sum, we reject Chen's arguments that his convictions on counts two and three, the substantive counts involving Teoh and Hsu, respectively, should be reversed. First, with respect to the extortionate threats Chen made against Teoh, venue was properly established. Second, with respect to the extortionate acts involving Hsu, the evidence of hovering, which took place at Foxwoods Casino in the District of Connecticut, was sufficient to convict. Moreover, the district court did not abuse its discretion in denying Chen's motion for a bill of particulars.

We also hold that the evidence at trial was sufficient to show that Sun participated in the extortionate collection from Teoh alleged in count two. We reject Sun's contention that his acquittal in the extortionate collection involving Hsu alleged in count three mandates acquittal on count one, the conspiracy count.

Thus, we have considered the arguments of defendants-appellants Chen and Sun, and find that none justifies reversal. We affirm the judgment of the district court.